UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-425-CR-COHN/SNOW

UNITED STATES OF AMERICA,

Plaintiff,

**SCANNED**

vs.

SAMUEL KNOWLES,

Defendant.

_____/

## ORDER RE: ADMISSIBILITY OF ALLEGED INEXTRICABLY INTERTWINED/RULE 404(b) EVIDENCE

THIS CAUSE is before the Court upon the United States' notices of intent to introduce inextricably intertwined or extrinsic evidence pursuant to Federal Rule of Evidence 404(b)[1] and memorandum thereto [DE 91]. The Court has carefully considered the Government's Notices and Memorandum, Defendant's Objection [DE 95], Government's Reply [DE 96], Defendant's Sur-Reply [DE 97], and is otherwise fully advised in the premises.

## I. BACKGROUND

Defendant Samuel Knowles was indicted by grand juries in the Southern District of Florida in two separate drug trafficking cases, 00-0425-CR-COHN and 00-1091-CR-HIGHSMITH. The grand juries returned the Indictments in May 2000 and December 2000, respectively. The May 2000 Indictment, now pending before this Court, charges Knowles with drug trafficking offenses committed in 1995-1996 while the December 2000 Indictment charges crimes committed from 1997 through 2000. The United

_____

[1] See Government's Reply to Standing Discovery Order [DE 65] filed October 17, 2006.

States submitted extradition requests to the Bahamas for Knowles in both cases. The request was granted as to the May 2000 Indictment only. Extradition was denied on the December 2000 Indictment.

The United States now seeks to introduce evidence of other alleged drug trafficking activities involving Knowles as inextricably intertwined with the facts underlying the instant Indictment. Alternatively, the Government contends that this evidence is admissible pursuant to Federal Rule of Evidence 404(b) as proof that Knowles intended to and had the knowledge and state of mind to commit the drug trafficking crimes charged in the May 2000 Indictment. Specifically, as stated in the Government's memorandum, it seeks to introduce the following evidence:

a) In or about the mid-1980s, co-conspirator Herbert Hanna and Knowles worked for a drug trafficking organization led by Ben Beneby. The Beneby drug organization used "go-fast" boats to transport thousands of kilograms of cocaine and thousands of pounds of marijuana to the United States. Over time, Knowles established himself as someone who Colombian sources of supply trusted to transport their cocaine loads. Consequently, Knowles began operating independently of the Beneby drug organization. In or about 1990, Hanna began to work exclusively for Knowles' drug organization. In the early 1990s, Knowles orchestrated the delivery of multi-hundred kilogram shipments of cocaine on behalf of Colombian drug traffickers and multi-hundred pound quantities of marijuana to the United States. During the early 1990s and continuing until the time of his arrest in June 2000, Hanna accompanied and ensured the safe transport of shipments of cocaine and marijuana that Knowles sent via "go-fast" boats to the United States;

b) In or about 1994 and continuing through in or about 1995:

1) Co-conspirators Nehru Newton, Calvin Johnson and William Curling utilized a 38 foot black midnight "go-fast" boat to pick up 2000 pounds of marijuana in Jamaica on behalf of Knowles;

2) Nehru Newton participated in at least three other drug smuggling operations in which Knowles tasked Newton

2

along with other co-conspirators to pick up multi-hundred kilogram quantities of cocaine and multi-thousand pound marijuana loads from Jamaica and then transport it to the Bahamas;

c) In or about 1995 and 1996, co-conspirator Derrick Blake met Knowles through Herbert Hanna. During this time period, Black received and distributed both marijuana and cocaine in Miami and elsewhere on behalf of Knowles. Thereafter, as Knowles' confidence in Blake increased, Blake began to pick up multi-hundred kilogram quantities of cocaine on behalf of Knowles from co-conspirator Jesus Alonso and others. In turn, Blake distributed the cocaine in Miami and elsewhere. After Blake distributed the cocaine, Blake collected, stored, and delivered millions of dollars in drug proceeds to Glenroy Riley and other co-conspirators on behalf of Knowles;

d) Beginning in or about early 1996, Knowles tasked co-conspirators Newton, Carllan Cambridge, and others to coordinate the pick up via "go-fast" boats of 1200 kilogram cocaine loads that were flown out of Colombia and air dropped off of the coast of Cuba. Members of Knowles' organization then picked up the loads and delivered them to Freeport, Bahamas and elsewhere. From 1996 continuing through in or about 1998, Newton and others coordinated air drops and "go-fast" deliveries with co-conspirators Gary McDonald and/or Sean Fox. Both McDonald and Fox acted as intermediaries between Colombian sources of supply and Knowles. In total, Newton participated in approximately twenty (20) air drops that involved 1200 kilograms of cocaine per air drop;

e) In or about November 1997, Knowles tasked Newton to pick up 480 kilograms of cocaine in Jamaica. Newton transported the cocaine to Freeport, Bahamas. On or about November 11, 1997, the DEA seized the 480 kilograms of cocaine in Jupiter, Florida;

f) In or about June 2000, at the direction of Knowles, Hanna and others attempted to deliver 1164 kilograms of cocaine and 879 pounds of marijuana to co-conspirator Jesus Alonso in Miami. United States Customs agents, however, seized the narcotics in the area of Dinner Key off the coast of Florida;

g) On or about July 24, 2000, DEA agents seized $2,563,260 of Knowles' drug proceeds from co-conspirator Frank Cartwright in Miami, Florida. RCMP Wire intercepts revealed that Knowles communicated with Frank Cartwright after the DEA seized the drug proceeds;

h) In or about August 2000, an airplane carrying $400,000 in

3

Knowles' drug proceeds departed from Opa Locka, Florida and landed in Freeport, Bahamas. When the Royal Bahamian Police Department attempted to stop co-conspirator Brian Bethel, a shootout ensued and Bethel escaped. RCMP wire intercepts captured Knowles and Bethel discussing the fact that the money had not been seized; and

i) In or about early 2001, co-conspirator Brian Bethel forfeited $2,422,325 of Knowles' drug proceeds to the Royal Bahamian Police Force.

## II. ANALYSIS

### A. Doctrine of Speciality

The first issue is whether the evidence is barred under the doctrine of speciality and the extradition treaty between the United States and the Bahamas. The doctrine of speciality states that "a nation that receives a criminal defendant pursuant to an extradition treaty may try the defendant only for those offenses for which the other nation granted extradition." United States v. Puentes, 50 F.3d 1567, 1572 (11th Cir. 1995). The extradition treaty between the United States and the Bahamas incorporates the doctrine. United States v. Bowe, 221 F.3d 1183, 1191 (11th Cir. 2000) (citing Extradition Treaty, Dec. 22, 1931, U.S.-Gr. Brit., art. 7, 47 Stat. 2122, 2124 (1932)). As stated by the Eleventh Circuit in Bowe:

It is well settled in this circuit that the doctrine of speciality limits only the charges on which an extradited defendant can be tried; it does not affect the scope of proof admissible at trial for the charges for which extradition was granted and it does not alter the forum country's evidentiary rules.

Id.

Following the holding in Bowe, the Court finds that the doctrine of speciality does not limit the scope of evidence admissible against the extradited Defendant during trial. Rather, it limits the charges which can be brought in the Indictment. Since here, the

4

Government is only charging Knowles for the crimes on which he was extradited, there is no violation of the doctrine of speciality. The Court shall therefore turn to whether the evidence is admissible under the Federal Rules of Evidence.

## B. Inextricably Intertwined/Rule 404(b) Standard

The Government argues that the above-listed evidence is admissible because it is either inextricably intertwined with the charged offenses or relevant to the purposes set forth in Rule 404(b). Rule 404(b) is an evidentiary rule of inclusion which allows for the introduction of extrinsic evidence of "other crimes, wrongs, or acts" not to show the character of a person or action in conformity with such character, but "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." However, where the evidence is not extrinsic, courts should not evaluate whether the other acts evidence is being used to reflect negatively on the defendant's character because such evidence is outside the ambit of Rule 404(b). United States v. Utter, 97 F.3d 509, 513 (11th Cir. 1996). Evidence is not extrinsic where it is "'1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense; 2) necessary to complete the story of the crime; or 3) inextricably intertwined with the evidence regarding the charged offense.'" United States v. Baker, 432 F.3d 1189, 1205 (11th Cir. 2005) (quoting United States v. Veltmann, 6 F.3d 1483, 1498 (11th Cir. 1993)). Intrinsic evidence is admissible "even if it tends to reflect negatively on the defendant's character," United States v. Foster, 889 F.2d 1049, 1053 (11th Cir. 1989) (internal citations omitted), provided that it is "'linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime to complete the

5

story of the crime for [sic] the jury.'" <u>United States v. Cannon</u>, 149 Fed. Appx. 937, 940

(11th Cir. 2005) (quoting <u>United States v. Wright</u>, 392 F.3d 1269, 1276 (11th Cir.

2004)). Nevertheless, intrinsic evidence may still be excluded under Rule 403. <u>United</u>

<u>States v. Fortenberry</u>, 971 F.2d 717, 721 (11th Cir. 1992).

     If the prior act evidence is determined to be "extrinsic" and therefore governed by

Rule 404(b), it may be admissible if it relates to an issue other than the defendant's

character and the government "1) has sufficient proof that the defendant committed the

prior act, and 2) can show that the probative value of the evidence is not substantially

outweighed by undue prejudice, and meets the other requirements of Rule 403."

<u>Baker</u>, 432 F.3d at 1205 n.9; <u>see also</u> <u>Utter</u>, 97 F.3d at 513; <u>Foster</u>, 889 F.2d at 1054.

In making a Rule 403 determination, the Eleventh Circuit holds "that if the extrinsic act

requires the same intent as the charged offenses <u>and if</u> these acts are proximate in

time to the charged offenses, then the extrinsic act is highly probative." <u>Baker</u>, 432

F.3d at 1205 (emphasis in original).

     In this case, the Government argues that the evidence is inextricably intertwined

with the evidence regarding the charged offense because it places the charged

conspiracy in context. Specifically, the Government claims that the evidence explains:

1) the formation of Knowles' drug organization; 2) the roles and responsibilities of its

members; and 3) the scope and breadth and methods by which Knowles' drug

trafficking organization operated prior, during, and subsequent to the charged

conspiracy. Additionally, the Government argues that the evidence is probative of

Knowles' voluntary participation in the charged offense. Knowles contends that the

evidence is not inextricably intertwined as it is evidence of entirely separate

conspiracies. He states that the Government's witnesses could relate the facts of the drug trafficking conspiracy at issue in the instant case without referencing the facts of the other conspiracies. Knowles also alleges that the evidence should be excluded because much of it is evidence of conduct which occurred subsequent to the charged conspiracy and it is not relatively closely linked in time to the conspiracy contained in the Indictment.

Alternatively, the Government alleges that the evidence is admissible under Rule 404(b) as it is highly probative of Knowles' intent to distribute. The Government contends that Knowles placed his knowledge and intent at issue by pleading not guilty to the crimes charged in the Indictment. Knowles argues that the evidence is inadmissible because his intent is not at issue in the case. Rather, he contends that he did not commit the physical acts alleged in the Indictment. Additionally, Knowles again claims that the other crimes evidence is not proximate in time to the charges in this case.

### C. Admissibility of Evidence

#### 1. Dealings with Co-Defendants Before and During Conspiracy (Items a - d above)

The Government seeks to introduce evidence regarding Knowles' dealings with the co-conspirators including his long-standing relationship with alleged co-conspirator Hanna, Knowles' interactions with the other co-conspirators, and evidence of various drug trafficking crimes which occurred in the mid-1980's, and from early 1990 through the time of the conspiracy. The Court finds that the evidence of the relationship and interaction of Knowles and his co-conspirators is inextricably intertwined with the crimes charged in this case as it places the relationship of the conspirators in context and aids

7

in explaining why Knowles trusted the co-conspirators and chose to participate in the alleged conspiracy. Cannon, 149 Fed. Appx. at 940; Foster, 889 F.2d at 1053.

Nevertheless, the Court must still engage in a Rule 403 analysis to determine if the inextricably intertwined evidence is admissible. The Court finds that the probative value of the majority of this evidence is substantially outweighed by its prejudicial effect. First, while the jury will benefit from understanding that Knowles and his co-conspirators maintained positions of trust and business dealings prior to the start of the conspiracy, the specifics of the relationships need not be introduced in order to place the instant conspiracy in context. It is not necessary for the jury to know that Knowles and his co-conspirators worked together in other drug organizations nor to receive detailed accounts of other drug trafficking acts in order to fully appreciate the context of the conspiracy alleged in this case. Therefore, unless Knowles opens the door to the illegalities of his prior dealings with his co-conspirators from the mid-1980's to the start of this conspiracy, the Government shall be limited to presenting general evidence regarding the fact that Knowles knew his co-defendants prior to the start of the instant conspiracy in a business setting and how long he knew them. Such evidence will establish the context by which Knowles came to join the conspiracy alleged in this case. See id. The Government may not, however, introduce evidence of the type of business they were engaged in or the specific drug deliveries orchestrated by Knowles and carried out by his co-conspirators during time periods outside those alleged in the conspiracy in this case. These crimes are remote in time, highly prejudicial to Knowles and unnecessary to place the instant conspiracy in context. As such, unless Knowles opens the door at trial by denying knowledge of the alleged co-conspirators or by

8

casting his prior dealings with his co-conspirators in an untruthful manner, the Government is limited to the introduction of evidence of the general relationships between Knowles and his co-conspirators and details of those acts which occurred during the time period covered by the instant Indictment. The criminality which occurred outside the scope of this Indictment is excluded.

### 2. Post-Indictment "Other Acts" Evidence (Items a, e-i above)

The remaining evidence which the Government seeks to introduce focuses on drug trafficking acts including the transport of drugs and drug proceeds which occurred after the conspiracy alleged in the Indictment. Essentially, the Government is seeking to introduce evidence of the crimes for which Knowles cannot be tried as the extradition request to try Knowles for these acts was denied by the Bahamian Government. The Court finds that this evidence is neither inextricably intertwined with the conspiracy in this case nor relevant to an issue other than Knowles' character or propensity to commit drug-related offenses. This evidence is not inextricably intertwined as the introduction of this evidence is not necessary to place the allegations in the Indictment in context. The crimes contained in the Indictment concluded in April 1996. Knowles' involvement in drug trafficking after that time is irrelevant to his participation in the instant conspiracy. Additionally, the evidence does not satisfy Rule 404(b). The evidence does nothing more than establish Knowles' alleged conformity with the character traits of a drug trafficker after the conclusion of the conspiracy in the Indictment. While Knowles' intent is at issue in this case by virtue of his plea of not guilty, the subsequent bad acts do not serve to establish Knowles' intent or knowledge at the time the alleged conspiracy began. Therefore, the evidence delineated in items a, e, f, g, h and i which

9

pertain to acts that occurred after April 1996 is deemed inadmissible subject to Knowles not opening the door.

## III. CONCLUSION

Based on the foregoing, it is **ORDERED AND ADJUDGED** as follows:

1. Evidence of the general relationships between Knowles and his co-defendants which predate the conspiracy charged are admissible;

2. Evidence of acts which occurred during the course and scope of the conspiracy at issue in this case are obviously admissible;

3. Any evidence of specific drug trafficking activities involving Knowles and his co-Defendants which occurred outside the conspiracy charged in this Indictment are not admissible unless the Defendant opens the door.  The alleged bad acts occurring after the conspiracy alleged are inadmissible as they are neither inextricably intertwined nor relevant to any issue other than the Defendant's character.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 30ᵀᴴ day of April, 2007.

JAMES I. COHN
UNITED STATES DISTRICT JUDGE

copies to:

All counsel of record